IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Boyd N. Boland

Civil Action No. 09-cv-02121-REB-BNB

KAREN S. ZANDER,

Plaintiff,

v.

CRAIG HOSPITAL, and
RICK BAYLES, PH.D., CNIM,

Defendants.
_____

**ORDER**
_____

This matter arises on **Defendants' Motion for Reconsideration of Order Dated March 2, 2010** [Doc. # 49, filed 3/9/2010] (the "Motion to Reconsider"). I held a hearing on the Motion to Reconsider on March 29, 2010, and took the matter under advisement. The Motion to Reconsider is directed to my Order [Doc. # 44] (the "Discovery Order") granting the Plaintiff's Motion to Compel Documents Claimed as Privileged By Defendant Craig Hospital [Doc. # 39] (the "Motion to Compel"). The Motion to Reconsider is GRANTED. Upon reconsideration, the Motion to Compel is GRANTED.

I.

The defendants do not specify the rule of procedure under which they bring their Motion to Reconsider. Motions to reconsider under Rule 60(b), Fed. R. Civ. P., serve a specific purpose and are not a mechanism merely to reargue, potentially interminably, matters previously presented and decided. To the contrary:

> The court has the opportunity upon a motion for reconsideration to

> correct manifest errors of law or fact and to review newly
> discovered evidence. Appropriate circumstances for a motion to
> reconsider are where the court has obviously misapprehended a
> party's position, the facts or law, or mistakenly has decided issues
> outside of those the parties presented for determination. It is
> inappropriate for the movant to advance new arguments or
> supporting facts which were otherwise available for presentation
> when the original . . . motion was briefed.

Pizza Management, Inc. v. Pizza Hut, Inc., 1989 WL 89937 *1 (D. Kan. July 19, 1989)(internal quotations and citations omitted).

As the Tenth Circuit Court of Appeals noted in Raytheon Constructors, Inc. v. Asarco Inc., 368 F.3d 1214, 1217 (10th Cir. 2003), however:

> The district court was incorrect to treat Raytheon's motion for
> reconsideration under Rule 60(b), which only applies to final
> orders or judgments. Instead, "any order . . . however designated,
> which adjudicates fewer than all the claims or the rights and
> liabilities of fewer than all the parties . . . is subject to revision at
> any time before the entry of judgment adjudicating all the claims
> an the rights and liabilities of all the parties." Fed. R. Civ. P.
> 54(b).

Here, Craig Hospital has presented for *in camera* review in connection with its Motion to Reconsider complete copies of the documents at issue in the Motion to Compel. These documents were not previously provided or available. The contents of the documents are central to the determination of the Motion to Compel. In view of the new evidence, I will GRANT the Motion to Reconsider.

II.

This is a negligence case against Dr. Rick Bayles, Ph.D., CNIM, in which the plaintiff alleges that Dr. Bayles breached the standard of care in connection with his responsibilities to monitor and report the plaintiff's somatosensory-evoked potential waveforms during spinal

2

surgery performed by Dr. Scott Falci, M.D.[1]  Complaint [Doc. # 1] at pp. 15-17.  Craig Hospital is sued on a theory of respondeat superior as the employer of Dr. Bayles.  Id. at pp. 17-18.  The plaintiff claims that she was rendered paraplegic as a result of Dr. Bayles' negligence.  Scheduling Order [Doc. # 11] at p. 4.

Dr. Falci testified at deposition that he conducted an investigation after the plaintiff's surgery to attempt to determine what led to her paralysis.  Deposition of Scott Falci [Doc. # 39-3] (the "Falci Depo.") at p. 89 line18 through p. 94 line 9.  In response to follow-up questioning about Dr. Falci's investigation, Craig Hospital interposed an objection based on the "quality assurance privilege" and instructed Dr. Falci not to answer.  Falci Depo. [Doc. # 39-3] at p. 94 lines 13-18.  Dr. Falci's lawyer joined in the objection and instructed his client not to answer.  Id. at p. 94 line 15 through p. 96 line 3.  Subsequently, the plaintiff sought through a request for the production of documents "a copy of Craig Hospital's quality management program."  Defendant Craig Hospital's Answers to Plaintiff's First Request for Production of Documents [Doc. # 39-6] (the "Written Discovery") at p. 2.  Craig Hospital objected to the request, stating:

> [The request] seeks information protected from discovery by Colorado law.  C.R.S. § 25-3-109(3) states that "<u>any</u> records, reports or other information . . . that are part of a quality management program . . . <u>shall be</u> confidential information." (Emphasis added).  The statute states that the "records, reports and other information described in subsection (3) . . . shall not be subject to subpoena or discoverable or admissible as evidence in any civil or administrative proceeding."  C..R.S. § 25-3-109(4).

---

[1]The plaintiff initially included a claim against Dr. Falci for medical negligence, but that claim has been dismissed.  Order Dismissing Defendant, Scott Falci, M.D., Only [Doc. # 14].

3

> This request for production asks for a copy of the "quality management program" which is, by the plain language of the statute, confidential information and not subject to discovery.

Written Discovery [Doc. # 39-6] at p. 2.[2]

In further support of the objection, Craig Hospital provided a privilege log that listed documents withheld from production based on the asserted privilege. The plaintiff seeks an order compelling the production of the following four documents listed on the privilege log:

(1) Performance Improvement and Safety Management Plan, dated April 2008 (the "Performance Improvement Plan");

(2) Safety Management Policy, dated December 2007. The document is actually captioned "Risk Management" (the "Risk Management Plan");

(3) Safety Management Policy, dated October 2006. The document is actually captioned "Sentinel Event/Adverse Event/Near Miss" (the "Sentinel Event Plan"); and

(4) Failure Mode and Effects Analysis, dated August 2004 (the "Failure Mode Plan").

Motion to Compel [Doc. # 39] at pp. 11-12. In addition, there is a fifth document, captioned Quality/Performance Improvement Plan, adopted May 25, 1995 (the "QP Plan"), which is not listed on the privilege log but was not produced to the plaintiff.[3]

---

[2]The request seeks discoverable information. In particular, the quality management program may demonstrate that Dr. Falci's investigation is not subject to the quality assurance privilege established by section 25-3-109, in which case further inquiry into Dr. Falci's investigation would be allowed. Thus, the request is reasonably calculated to lead to the discovery of admissible evidence.

[3]Initially, in response to the Motion to Compel, Craig Hospital submitted a portion of the QP Plan for *in camera* review. Subsequently, in connection with its Motion to Reconsider, Craig Hospital provided for *in camera* review complete copies of all five documents. These documents describe the quality management functions practiced at Craig Hospital, and I have termed them the "organic documents."

4

III.

The quality assurance privilege relied on by Craig Hospital is contained in section 25-3-109, C.R.S., and provides in relevant part:

> (1)  The general assembly hereby finds and declares that the implementation of quality management functions to evaluate and improve patient and resident care is essential to the operation of health care facilities licensed or certified by the department of public health and environment pursuant to section 25-1.5-103(1)(a).  For this purpose, it is necessary that the collection of information and data by such licensed or certified health care facilities be reasonably unfettered so a complete and thorough evaluation and improvement of the quality of patient and resident care can be accomplished.  To this end, quality management information relating to the evaluation or improvement of the quality of health care services shall be confidential, subject to the provisions of subsection (4) of this section, and persons performing such functions shall be granted qualified immunity. . . .
>
> (2)  For purposes of this section, a "quality management program" means a program which includes quality assurance and risk management activities, the peer review of licensed health care professionals not otherwise provided for in part 1 of article 36.5 of title 12, C.R.S., and other quality management functions **which are described by a facility in a quality management program approved by the department of public health and environment**. . . .
>
> (3)  Except as otherwise provided in this section, any records, reports, or other information of a licensed or certified health care facility **that are part of a quality management program** designed to identify, evaluate, and reduce the risk of patient or resident injury associated with care or to improve the quality of patient care shall be confidential information; except that such information shall be subject to the provisions of subsection (4) of this section.
>
> (4)  The records, reports, and other information described in subsection (3) and subsection (5.5) of this section shall not be subject to subpoena or discoverable or admissible as evidence in any civil action or administrative proceeding.  No person who participates in the reporting, collection, evaluation, or use of such

quality management information with regard to a specific circumstance shall testify thereon in any civil or administrative proceeding. However, this subsection (4) shall not apply to:

(a) Any civil or administrative proceeding, inspection, or investigation as otherwise provided by law by the department of public health and environment or other appropriate regulatory agency having jurisdiction for disciplinary or licensing sanctions;

(b) Persons giving testimony concerning facts of which they have personal knowledge acquired independently of the quality management information program or function;

(c) The availability, as provided by law or the rules of civil procedure, of factual information relating solely to the individual in interest in a civil suit by such person, next friend, or legal representative. In no event shall such factual information include opinions or evaluations performed as a part of the quality management program.

(d) Persons giving testimony concerning an act or omission which they have observed or in which they participated, notwithstanding any participation by them in the quality management program;

(e) Persons giving testimony concerning facts they have recorded in a medical record relating solely to the individual in interest in a civil suit by such person.

(5) Nothing in this section shall affect the voluntary release of any quality management record or information by a health care facility; except that no patient-identifying information shall be released without the patient's consent.

(Emphasis added.)

The Colorado quality assurance privilege created by section 25-3-109 contemplates that licensed health care facilities may create a "quality management program" which they may submit to the Colorado department of public health and environment for approval. Section 25-3-109(2), C.R.S. After a facility obtains approval of its quality management program, it may

engage in the quality management functions described in its quality management program, such as gathering and preparing "records, reports, or other information" to "identify, evaluate, and reduce the risk . . . or to improve the quality of patient care," and those activities are confidential and not discoverable pursuant to the quality assurance privilege. Section 25-3-109(3)-(4), C.R.S.

Section 25-3-109(3) provides that the "records, reports, or other information of [the] licensed . . . health care facility that are part of [the] quality management program . . . shall be confidential information. . . ." Id. The question raised by the Motion to Compel is whether the documents constituting the quality management program (the "organic documents") are privileged, or whether the privilege attaches only to the materials gathered and prepared in the practice of particular quality management functions.

IV.

Discovery in federal court is governed by the Federal Rules of Civil Procedure, regardless of whether jurisdiction is based on a federal question or diversity of citizenship. Atteberry v. Longmont United Hospital, 221 F.R.D. 644, 646 (D. Colo. 2004). Where, as here, the "case [is] based upon a state cause of action, state law controls the determination of privileges." White v. American Airlines, Inc., 915 F.2d 1414, 1424 (10th Cir. 1990); see Fed. R. Evid. 501 ("[I]n civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law").

A party asserting a privilege has the burden of showing that the privilege applies. Atteberry, 221 F.R.D. at 649. To carry that burden, the party claiming the privilege must make a

"clear showing" that the withheld information is privileged. Bethel v. United States, 242 F.R.D. 580, 583 (D. Colo. 2007). The framework for discovery established by the Federal Rules of Civil Procedure evidences a policy favoring the full disclosure of facts before trial to aid in the search for the truth. Id. at 584. Consistent with that policy, evidentiary privileges are disfavored. Herbert v. Lando, 441 U.S. 153, 175 (1979). Those privileges, which are "in derogation of the search for the truth," are "not lightly created nor expansively construed." United States v. Nixon, 418 U.S. 683, 710 (1974).

V.

In the Discovery Order [Doc. # 44], I noted that privileges generally have prerequisites which must be satisfied before a privilege attaches. Id. at p. 6. I drew an analogy to the Colorado law establishing an attorney-client privilege. The Colorado statutory attorney-client privilege makes confidential "any communication made by the client to [the attorney] or his advice given thereon in the course of professional employment. . . ." Section 13-90-107(1)(b), C.R.S. Before the Colorado attorney-client privilege attaches, however, certain conditions not expressly stated in the statute must be shown to have existed. For example, the privilege attaches only to matters (1) communicated confidentially, Losavio v. District Court, 533 P.2d 32, 35 (Colo. 1975); (2) relating to the subject matter of the attorney's engagement, id.; and (3) not intended to be conveyed by the attorney to others. Hill v. Hill, 107 P.2d 597, 599 (Colo. 1940).[4]

---

[4]These cases make clear that Craig Hospital is wrong when it argues that the scope and contour of the quality assurance privilege must be derived from the words of the statute alone. To the contrary, the purpose of the privilege plays a part in understanding the words by which it is expressed. See Losavio, 533 P.2d at 34 (recognizing that the "purpose of the attorney-client privilege is to secure the orderly administration of justice by insuring candid and open discussion by the client to the attorney without fear of disclosure").

8

Similarly, in Bethel v. United States, 242 F.R.D. at 585, I found that the federal Veterans Administration quality assurance privilege in connection with an investigation of medical services provided by the VA attaches to protect documents arising from a "root cause analysis" only when the prerequisites established by federal regulations are met, including that the analysis "must be 'designated by the reviewing office <u>at the outset</u> of the review as protected by 38 U.S.C. § 5705. . . .'" (Emphasis added.)

Craig Hospital argues on reconsideration that "there are no formal requirements to trigger or activate these privileges. There aren't any. . . . The only thing necessary to trigger this is that there be an approved health plan on file with the state. . . . That is the only condition necessary to have the investigation be confidential and non-discoverable." Record of Proceedings of March 29, 2010 ("Record of Proceedings"), at 4:06:20 p.m. and 4:07:50 p.m. Craig Hospital also argues that once there is a state approved plan all discussions that take place among health care professionals, facility administrators, and other unspecified persons, including gossip, concerning a procedure or treatment are privileged and not discoverable pursuant to the quality assurance privilege. Id. at 4:24:40 p.m.

I do not agree that the statutory quality assurance privilege is so sweeping. My understanding that the privilege is more narrow comes from the words of the statute itself. Only "records, reports, or other information . . . that are part of a quality management program" are confidential. Section 25-3-109(3), C.R.S. For any quality management privilege to exist, there must be a "quality management program." Id. The statute defines a "quality management program" as:

> [A] program which includes quality assurance and risk
> management activities, the peer review of licensed health care

9

> professionals not otherwise provided for in part 1 of article 36.5 of title 12, C.R.S., and other quality management functions **which are described by a facility in a quality management program approved by the department of public health and environment**.

Section 25-3-109(2), C.R.S. (emphasis added).

The plain language of the statute declares that only the "records, reports, or other information of a licensed or certified health care facility" resulting from activities "described . . . in a quality management program" which has been approved by the state are confidential. Information resulting from other sources, including gossip or a doctor acting on his own initiative, if not described by the facility in its state approved quality management program, is not privileged. See, e.g., Doe v. UNUM Life Ins. Co. of America, 891 F. Supp. 607, 611 (N.D. Ga. 1995)(applying Georgia law and holding that "documents that would have existed regardless of whether the committee may have considered them in an investigation are discoverable, but only from their original source"); Babcock v. Bridgeport Hospital, 742 A.2d 322, 350-52 (Conn. 1999)(holding that Connecticut's medical studies privilege is "limited to the designated materials of a hospital staff committee that are generated primarily for the purpose of the study of morbidity and mortality, undertaken specifically for the purpose of reducing the incidence of patient deaths"); Roach v. Springfield Clinic, 623 N.E.2d 246, 251 (Ill. 1993)(applying Illinois law and holding that the contents of a conversation between a nurse and a doctor about a baby's delivery before any peer review committee was initiated is not privileged); Shelton v. Morehead Memorial Hospital, 347 S.E.2d 824, 829 (N.C. 1986)(applying North Carolina law and holding that "information, in whatever form available, from original sources other than the medical review committee is not immune from discovery or use at trial merely because it was presented during medical review committee proceedings; neither should one who is a member of a medical

review committee be prevented from testifying regarding information he learned from sources other than the committee itself, even though that information might have been shared by the committee"); Giusti v. Akron General Medical Center, 896 N.E.2d 769, 777 (Ohio App. 2008)(applying Ohio law, finding that the hospital had failed to carry its burden to show that a conversation between two doctors shortly after a patient's death was part of a peer review committee proceeding, and affirming the trial court's order compelling discovery); Bush v. Dolan, 540 N.Y.S.2d 21, 23(App. Div. 1989)(applying New York law and holding that "a hospital is required, at a minimum, to show that it has a review procedure and that the information for which the exemption is claimed was obtained or maintained in accordance with that review procedure"). The quality assurance privilege is not designed to hide from discovery admissions or inconsistent statements made outside the scope of a health care facility's approved quality management program.

The organic documents submitted by Craig Hospital for *in camera* review in connection with the Motion for Reconsideration establish, as I suspected they would,[5] that the quality management functions described by Craig Hospital have specific requirements. For example, the Sentinel Event Plan describes Craig Hospital's procedure for performing a root cause analysis, which is a quality management function. However, to fall within the description of the Sentinel Event Plan, the following requirements must be satisfied:

(1) There must be a sentinel event, adverse event, or near miss (the "Event") as defined

---

[5]See Order [Doc. # 44] at p. 7-8 (anticipating that Craig Hospital's organic documents might "require that the facility's chief medical officer must approve at the outset any investigation which will be subject to the quality assurance privilege," and equating it to the requirements established by regulation in connection with the Veteran's Administration quality assurance privilege described in Bethel v. United States, 242 F.R.D. at 585.

in the plan;

(2) Hospital personnel must notify an immediate supervisor of the Event and complete an Occurrence (Incident) Report;

(3) The president of Craig Hospital (or his designee) must evaluate the incident, gather facts, review the incident report, and confirm that the incident should be classified as a sentinel event;

(4) The president (or his designee) must call a sentinel event committee meeting. The committee is to include specified hospital administrators and "as deemed appropriate, pertinent hospital staff and/or physicians"; and

(5) "If the event is determined to be a sentinel event, or other event that requires intense analysis," a root cause analysis investigation is instituted. Sentinel Event Plan at pp. 2-4.

Similarly, the Failure Mode Plan describes Craig Hospital's process for performing a Failure Mode and Effects Analysis ("FMEA"), which is another quality management function. However, to constitute an FMEA as described by Craig Hospital, the following requirements exist:

(1) Craig Hospital's Quality Council[6] is responsible for identifying the process or event to be analyzed and convening the appropriate FMEA team;

(2) A multi-disciplinary team must be assembled, including "subject matter experts and

---

[6]The Quality Council is defined in the Performance Improvement Plan to include three members of the active attending medical staff, including the medical director; a Board of Directors representative; the vice president of clinical services; the vice president of patient care services or designated representative; the director of quality management; and the clinical department director designated by the Council. Performance Improvement Plan, ¶VIII.B.2.1 at p. 10.

12

an advisor"; and

(3) The team must graphically describe the process; conduct a hazard analysis; identify actions and outcome measures; and report its results. Failure Mode and Effects Analysis at pp.1-2.

A third quality management function described by Craig Hospital is contained in its Risk Management Plan. The Risk Management Plan imposes on Craig Hospital's staff a duty of "[c]ooperation in all phases of follow-up and investigation of unusual incidents claims, etc., **as arranged by Administration**." Risk Management Plan at p. 1, ¶II.C (emphasis added). In addition, the Risk Management Plan requires medical staff practitioners to "[r]eport unusual incidents **through identified, prescribed channels**; provide and document medical assessments and treatment of injuries to patients **per policies**." Id. at p. 2 ¶I.D (emphasis added).

In every instance, however, Craig Hospital's organic documents establish requirements to be complied with when the hospital undertakes a quality management function. A quality management program is not simply a free-for-all, as Craig Hospital suggests, in which every word uttered by a licensed health care professional or facility administrator following a procedure or treatment is privileged.

Craig Hospital argues that imposing upon health care facilities the obligation to comply with the written requirements of their quality management programs would "result in care providers refusing to volunteer and cooperate with the quality management functions in the future." Motion to Reconsider [Doc. # 49] at p. 12. I do not agree. Requiring attorneys and clients to comply with the requirements of the attorney-client privilege has hardly inhibited the candid and open discussion between attorneys and their clients. Licensed health care facilities

13

enjoy all of the protections of the quality assurance privilege so long as they are conducting legitimate quality management functions in a manner described in their quality management programs approved by the Colorado department of health and environment.

Craig Hospital also argues that requiring a health care facility to comply with its quality management program as a condition to asserting the quality assurance privilege will result in mini-trials to determine whether there was compliance with the program. Record of Proceedings at 4:16:00 p.m. Again, I do not agree. A health care facility must assert the quality assurance privilege and establish its applicability in the same manner as a party asserting the attorney-client privilege or any other privilege.

VI.

The statute creating the Colorado quality assurance privilege states that licensed health care facilities must collect "information and data" "to evaluate and improve patient . . . care." Section 25-3-109(1), C.R.S. In addition, the statute makes the "information relating to the evaluation or improvement of the quality of health care services" confidential. Id. It is the information and data collected for evaluation which is entitled to confidential treatment and which is privileged.

The argument that the organic documents which describe Craig Hospital's quality management functions are privileged is contrary to the plain meaning of the statute and illogical. As demonstrated above, Craig Hospital's organic documents establish requirements when undertaking quality management functions. To make the organic documents privileged would allow a facility to establish a quality management program, which imposes requirements on the facility when undertaking quality management functions protected from disclosure by the quality

14

assurance privilege, but to preclude review of whether the facility complied with the requirements prerequisite to invoking the privilege. As a result, the quality assurance privilege for all practical purposes would remain undefined and unlimited. Such a construction of the Colorado quality assurance privilege is contrary to the requirement that a privilege which is "in derogation of the search for the truth" may not be "expansively construed." United States v. Nixon, 418 U.S. at 710.

The cases from other jurisdictions cited by Craig Hospital do not support the argument that organic documents, like those at issue here, are privileged. Instead, those cases apply the applicable privilege to documents created in connection with particular quality management investigations. Cf., Weekoty v. United States, 30 F. Supp. 2d 1343, 1344 (D. N.M. 1998)(concerning "documents related to a morbidity and mortality review convened after Mr. Weekoty died while in the care of Dr. Julie Magri"); Ex parte Fairfield Nursing and Rehabilitation Center, L.L.C., 22 So.3d 445, 446 (Ala. 2009)(concerning "incident reports and witness statements . . . created for quality-assurance purposes"); Braverman v. Columbia Hospital, Inc., 629 N.W.2d 66, 69 (Wis. App. 2001)(concerning "(1) infection control materials, including meeting minutes, infection rates, and the results of any investigations conducted by quality assurance/peer review committees; (2) reports and/or evaluations of the Joint Commission on Hospital Accreditation; and (3) information derived from a quality assurance investigation conducted in association with the Wisconsin Department of Health"); and In re Osteopathic Medical Center of Texas, 16 S.W.3d 881, 884 (Tex. App. 2000)(concerning "pre-printed forms of the hospital . . . completed immediately after or shortly after Ms. Erickson's fall"); Albany Medical Center Hospital v. Denis, 557 N.Y.S.2d 523, 524 (App. Div.

1990)(concerning "documents, including minutes of meetings"); Bielewicz v. Maplewood Nursing Home, Inc., 778 N.Y.S.2d 666, 667 (N.Y.Sup. 2004)(concerning "reports and documents prepared by the defendant nursing home's quality assurance committee").

Craig Hospital also cites Bernholc v. Kitain, 741 N.Y.S.2d 736 (App. Div. 2002). The New York Appellate Division's decision is cursory and cryptic. The opinion of the trial court, however, makes clear that the materials claimed as privileged were "information relating to the internal peer review proceedings and Quality Management activities" of a hospital against a specific doctor, and not organic documents. Bernholc v. Kitain, 720 N.Y.S.2d 737 (N.Y. Sup. 2000), *vacated*, 741 N.Y.S.2d 736 (App. Div. 2002).

In Shelton v. Morehead Memorial Hospital, 332 S.E.2d 499, 500 (N.C. App. 1985), *aff'd in part and modified*, 347 S.E.2d 824 (N.C. 1986), the intermediate appellate court of North Carolina held that "policies, procedures and guidelines relating to risk management and prescribed standards" were privileged, along with "personnel records including documents relating to the investigation of Dr. Ross' and Dr. Shapiro's credentials; . . . records, minutes and documents of the peer review committee and/or the Executive Committee of the Medical Staff; [and] . . . incident reports. . . ." The North Carolina Supreme Court clarified on subsequent review, however, that the state privilege "protects only a medical review committee's (1) proceedings; (2) records and materials it produces; and (3) materials it considers," and remanded to the trial court for further proceedings consistent with its order. Shelton v. Morehead Memorial Hospital, 347 S.E.2d 824, 829 (N.C. 1986). Thus, the North Carolina privilege applies only to the work product of a medical review committee and not to the organic documents defining the functions of the committee.

16

Craig Hospital has failed to meet its burden to make a clear showing that the Colorado quality assurance privilege applies to the organic documents here at issue. Accordingly, the Motion to Compel must be GRANTED.

VII.

IT IS ORDERED that the Motion to Reconsider is GRANTED. Upon reconsideration,

IT IS FURTHER ORDERED that the Motion to Compel is GRANTED. Craig Hospital shall produce the following documents in their entirety to the plaintiff on or before **April 16, 2010**:

(1) Performance Improvement and Safety Management Plan, dated April 2008;

(2) Safety Management Policy (captioned "Risk Management" ), dated December 2007;

(3) Safety Management Policy (captioned "Sentinel Event/Adverse Event/Near Miss") , dated October 2006;

(4) Failure Mode and Effects Analysis, dated August 2004; and

(5) Quality/Performance Improvement Plan, adopted May 25, 1995.

Dated April 8, 2010.

BY THE COURT:

s/ Boyd N. Boland
United States Magistrate Judge